UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CALTON & ASSOCIATES, INC.,
DWAYNE K. CALTON, individually
and as Trustee of the DWAYNE K.
CALTON TRUST, UTA 3/30/1989,
RANDALL L. CICCATI,
RAMESHWAR SINGH, DEREK J.
CALTON, LORETTA D. CALTON,
GEORGE G. HARRINGTON, JR., and
JILL M. CICCATI,

    Plaintiffs,

v.                          Case No. 8:20-cv-851-T-33CPT

JOHN SIMMERS, individually and as
Trustee of the SIMMERS FAMILY
TRUST DATED 9/18/92,

    Defendant.

_____/

**<u>ORDER</u>**

    This matter is before the Court on consideration of Defendant's Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay Case (Doc. # 19), filed on May 22, 2020. Plaintiffs responded on June 5, 2020 (Doc. # 28). For the reasons detailed below, the Motion is denied.

## I.   <u>Background</u>

### A.   <u>Factual Background</u>

The following facts are derived from the Plaintiffs' complaint and the Statement of Claim ("SOC") filed on December 27, 2019, by Defendant John Simmers before the Financial Industry Regulatory Authority ("FINRA") dispute resolution forum, which document Plaintiffs attached to their complaint.

Plaintiff Calton & Associates, Inc. ("CAA") is a securities broker-dealer licensed with FINRA. (Doc. # 1 at ¶ 1; Doc. # 1-1 at ¶ 15). In 2011, an entity named Aatria, LLC, approached CAA about purchasing CAA stock. (Doc. # 1 at ¶ 24). Plaintiffs Dwayne Calton, individually and as trustee of the Dwayne K. Calton Trust, Derek Calton, Loretta Calton, and George Harrington, Jr., all agreed to sell their personal stock in CAA to Aatria. (<u>Id.</u> at ¶ 25). Accordingly, in May 2011, the selling shareholders of CAA entered into two agreements with Aatria: (1) a Stock Purchase Agreement (the "2011 Stock Purchase Agreement"), and (2) a Stock Option Agreement (the "2011 Stock Option Agreement."). (<u>Id.</u> at ¶ 29).

Under these agreements, the CAA shareholders sold 10% of their CAA stock to Aatria immediately, and Aatria held the right to exercise various options to purchase additional

shares totaling up to 100% of CAA stock, subject to the sellers' right to retain 20% of the company. (Id. at ¶¶ 30-31; Doc. # 1-1 at ¶ 33; 132-34). Aatria was the sole purchaser under the 2011 agreements and Simmers was not a party to either agreement. (Doc. # 1 at ¶¶ 27-28).

The 2011 Stock Purchase Agreement and 2011 Stock Option Agreement both contain arbitration clauses that provide as follows:

> The Parties agree that all controversies, claims, disputes and matters in question arising out of, or related to [those agreements], the breach of [those agreements], interpretation of [those agreements], the purchase of [the sellers' securities pursuant to the 2011 Stock Purchase Agreement or the option shares pursuant to the 2011 Stock Option Purchase Agreement] or any other matter or claim whatsoever, including statutory claims, common-law claims[,] tort claims[,] and choses in equity, shall be decided by binding arbitration before the American Arbitration Association, utilizing its Commercial Rules. Venue for any arbitration between the Parties shall be had and is mandatory in Hillsborough County, Florida to the exclusion of all other places of venue, for all matters that arise under or are related to this Agreement. In the event it is determined that FINRA rules and regulations supersede any agreement to arbitrate before the American Arbitration Association, Buyer hereby specifically instructs the FINRA Director of Arbitration to assign arbitration of all arbitration claims to the FINRA Boca Raton, Florida office (and any successor thereof) and to designate that the final hearing location be Tampa, Hillsborough County, Florida.

(Doc. # 1-1 at 128, 137-38).

A few months after the 2011 agreements were executed, Simmers became involved with CAA. Plaintiffs allege that Simmers became a registered broker at CAA. (Doc. # 1 at ¶ 46). Simmers stated in the SOC that he became an "associated person" of CAA but denies that he acted as a broker or dealer. (Doc. # 1-1 at ¶¶ 40-41). Furthermore, Plaintiffs allege that, in April 2012, Simmers opened a CAA brokerage account for the Simmers Family Trust, in which Simmers listed himself as the CAA broker responsible for the account. (Doc. # 1 at ¶¶ 47-48). For his part, Simmers alleged that throughout 2011 and 2012, he was in discussions with Plaintiffs Randall Ciccati and Rameshwar Singh and non-party Keith Gregg about purchasing CAA stock through Aatria's existing contracts. (Doc. # 1-1 at ¶¶ 42-43).

To that end, in September 2012, Simmers executed a Memorandum of Understanding with CAA, the CAA shareholders, Dwayne Calton, Aatria, Scott Sherwood (a principal at Aatria), Randall Ciccati, Singh, and Gregg (the "2012 MOU"). (Doc. # 1-1 at 142-52). The 2012 MOU set forth the parties' expectations about the ultimate division of CAA stock ownership, with Dwayne Calton and the other CAA shareholders owning 20% of the company, Aatria and/or Sherwood holding 23%, Simmers holding 17%, Ciccati and Gregg each holding 15%,

and Singh owning 10%. (Id. at 143). The 2012 MOU also contained an arbitration clause:

> The Parties agree that all controversies, claims, disputes and matters in question arising out of, or related to this Memorandum, the performance under this Memorandum, the alleged breach of any term of this Memorandum or any other matter or claim whatsoever, including but not limited to common law claims, tort claims, choses in equity and statutory claims, shall be decided by binding arbitration before the American Arbitration Association, utilizing its Securities or Commercial Rules, as applicable. Venue for any arbitration between the Parties shall be had and is mandatory in Hillsborough County, Florida to the exclusion of all other places of venue, for all matters that arise under or are related in any manner to this Memorandum. In the event it is determined that FINRA rules and regulations supersede any agreement to arbitrate before the American Arbitration Association, Buyer hereby specifically instructs the FINRA Director of Arbitration to assign arbitration of all arbitration claims to the FINRA Boca Raton, Florida office (and any successor thereof) and to designate that the final hearing location be Tampa, Hillsborough County, Florida.

(Id. at 148).

In 2013, Simmers, Gregg, Randall Ciccati, Singh, Sherwood, Aatria, and Innovation Equity Partners, LLC signed a binding agreement among themselves pertaining to their ownership of CAA stock (the "2013 Binding Agreement"). (Doc. # 1 at ¶¶ 64-66; Doc. # 1-1 at ¶¶ 64-68). Simmers represented in the SOC that the parties entered into the 2013 Binding Agreement due to concerns about Sherwood's failing health,

and so that agreement allowed each of the parties an opportunity to purchase CAA stock in a manner that would make them all co-equal shareholders of CAA. (Doc.# 1-1 at ¶¶ 65, 67). The 2013 Binding Agreement contained an arbitration provision that was substantially identical to the arbitration provisions in the 2011 agreements and the 2012 MOU. Namely, it provided that "all controversies, claims, disputes and matters in question arising out of, or related to" the agreement "shall be decided by binding arbitration before the American Arbitration Association, utilizing its Commercial Rules. . . . In the event it is determined that FINRA rules and regulations supersede any agreement to arbitrate before the American Arbitration Association, . . . ." (Doc. # 1-1 at 157).

By May 2014, Aatria and its affiliated persons had exercised their options under the 2011 agreements and had purchased 80% of CAA stock, with the selling shareholders exercising their right to retain 20% of the company.[1] (Doc. # 1 at ¶ 32; Doc. # 1-1 at ¶¶ 97-98).

---

[1] According to the SOC, these options were executed through a complex set of transactions involving an internal loan to Randall Ciccati and the involvement of multiple shareholders' adult children. (Doc. # 1-1 at ¶¶ 69-97). As Simmers explains in the SOC, the point of these complicated corporate maneuvers was to avoid a FINRA rule that requires certain reporting

Thereafter, Singh, Aatria, Randall Ciccati, Jill Ciccati, and John Simmers and Margaret Simmers, in their capacities as trustees for the Simmers Family Trust, entered into an option contract (the "2014 Stock Option Agreement"). (Doc. # 1 at ¶¶ 72-73; Doc. # 1-1 at ¶¶ 99-110). That agreement granted Singh an option to purchase CAA stock directly from Aatria, Randall Ciccati, and Simmers, rather than Singh exercising his option to purchase stock from CAA. (Doc. # 1-1 at ¶ 99). Simmers alleges in the SOC that he was fraudulently induced to enter into the 2014 Stock Option Agreement. (Id. at ¶¶ 222-42). The 2014 Stock Option Agreement also had a familiar arbitration provision: "The Parties agree that all controversies, claims, disputes and matters in question arising out of, or related to this Agreement . . . shall be decided by binding arbitration before the American Arbitration Association, utilizing its Securities or Commercial Rules, as applicable. . . . In the event it is determined that FINRA rules and regulations supersede any agreement to arbitrate before the American Arbitration Association . . . ." (Doc. # 1-1 at 161).

---

requirements if any one person, entity, or group owns 25% or more of one of its members. (Id. at ¶ 79). The intricacies of those transactions are not pertinent to the Motion now before the Court.

**B.**   <u>**Procedural History**</u>

In December 2019, Simmers filed a 13-count complaint (the SOC) before FINRA against Dwayne Calton, both individually and as Trustee of his trust, Randall Ciccati, Jill Ciccati, Singh, Derek Calton, Loretta Calton, and Harrington. (Doc. # 1-1). Simmers brought claims related to the 2011 agreements, the 2012 MOU, the 2013 Binding Agreement, and the 2014 Stock Option Agreement. <u>See</u> (<u>Id.</u>).

On April 14, 2020, Plaintiffs CAA, Dwayne K. Calton, both individually and as Trustee of the Dwayne K. Calton Trust, Singh, Derek Calton, Loretta Calton, Harrington, Randall Ciccati, and Jill Ciccati filed this lawsuit seeking a declaratory judgment and injunctive relief against Simmers, individually and as Trustee of the Simmers Family Trust. (Doc. # 1). Specifically, Plaintiffs seek a declaratory judgment that Simmers' claims are not arbitrable before FINRA. (Doc. # 1 at ¶ 138, pp. 26-27). Plaintiffs also seek an injunction from this Court imposing a stay of the FINRA arbitration and preventing Simmers from pursuing any claims against the Plaintiffs in the FINRA arbitration. (<u>Id.</u> at 27).

On May 22, 2020, Simmers filed the instant Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay Case (Doc. # 19), seeking an order from this Court

8

compelling arbitration of his claims before the FINRA dispute resolution forum (presumably, the forum in which he already filed the SOC) and dismissing this case. Plaintiffs have responded (Doc. # 28), and the Motion is ripe for review.

## II.  **Legal Standard**

There is a strong federal policy supporting arbitration. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). However, "no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate." Seifert v. U.S. Home Corp., 750 So. 2d 633, 636 (Fla. 1999).

"[T]he [Federal Arbitration Act ("FAA")] requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." Lambert v. Austin Ind., 544 F.3d 1192, 1195 (11th Cir. 2008) (citing 9 U.S.C. §§ 2-4).

Here, the parties' agreements all state that they are governed by Florida law. (Doc. # 1-1 at 127, 137, 148, 157, 161). Because the Court should apply ordinary state-law contract principles, the Court looks to Florida law to

9

determine if there is an enforceable arbitration agreement. "Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." <u>Seifert</u>, 750 So. 2d at 636.

## III. <u>Analysis</u>

At base, the parties' fundamental disagreement is whether the parties should arbitrate their disputes before the American Arbitration Association ("AAA"), as the Plaintiffs suggest, or before FINRA, as Simmers desires.

The first issue that this Court must address is whether it may properly rule on the gateway issues of arbitrability raised in the Motion to Compel. Courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995) (quotations and alterations omitted); <u>accord</u> <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986) ("[T]he question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties

clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

Whether parties have an enforceable agreement to arbitrate, along with the scope of the issues that they agreed to arbitrate, are threshold arbitrability issues. See Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 68-69 (2010)(recognizing that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether the agreement covers a particular controversy").

With this background in mind, the Court turns to the language of the parties' agreements. Here, while there are five contracts at play, all contain nearly identical arbitration provisions. They all provide that:

> The Parties agree that all controversies, claims, disputes, and matters in question arising out of, or related to [these agreements] . . . **shall be decided by binding arbitration before the American Arbitration Association, utilizing [its Commercial Rules or its Securities or Commercial Rules, as applicable]. . . . In the event it is determined that FINRA rules and regulations supersede any agreement to arbitrate before the American Arbitration Association,** the Parties hereby specifically instruct the FINRA Director of Arbitration to assign the administration of all claims to the FINRA Boca Raton, Florida office[.]

See, e.g., (Doc. # 1-1 at 148) (emphases added). Although the agreements are clear that arbitration may not proceed before FINRA until some entity determines that FINRA rules supersede the agreement to arbitrate before the AAA, no agreement specifies what entity should make that determination. (Id.).

In addition, all agreements except for the 2012 MOU provided that:

> The Parties agree that courts of competent jurisdiction in Hillsborough County, Florida and the United States District Court for the Middle District of Florida, Tampa division shall have exclusive concurrent jurisdiction with the arbitration tribunals of the American Arbitration Association for purposes of entering temporary, preliminary and permanent injunctive relief with regard to any action arising out of any breach or alleged breach of this [Agreement].

(Doc. # 1-1 at 127, 137, 157, 161). The 2012 MOU provided that: "The Parties agree that courts of competent jurisdiction in Tampa, Hillsborough County, Florida shall have jurisdiction for equitable relief or to compel arbitration[.]" (Id. at 148).

In the Eleventh Circuit, when the parties incorporate into their agreement arbitral rules granting the arbitrator the power to rule on the arbitrability of the dispute, the parties "clearly and unmistakably evince an intent to delegate questions of arbitrability." JPay, Inc. v. Kobel,

904 F.3d 923, 937 (11th Cir. 2018). In JPay, the Eleventh Circuit reiterated that incorporating the AAA Rules in an arbitration agreement was sufficient to grant the arbitrator the power to decide questions of arbitrability because the AAA rules "gave the arbitrator 'the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.'" Id. at 945 (quoting Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1332 (11th Cir. 2005)).

In Terminix, the parties' arbitration agreement provided that "arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the [AAA]." 432 F.3d at 1332. The Eleventh Circuit pointed out that, under Rule 8(a) of those rules, arbitrators have the power to rule on their own jurisdiction, including any objections to the existence, scope, or validity of the arbitration agreement. Id. Thus, the Eleventh Circuit concluded that "[b]y incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid." Id.

Here, the parties' arbitration agreements explicitly reference the Commercial and/or Securities Rules of the AAA.

13

See, e.g., (Doc. # 1-1 at 148) (directing that all controversies or disputes "shall be decided by binding arbitration before the [AAA], utilizing its Commercial Rules"). Thus, the Court finds that the language in the arbitration clauses incorporating the commercial arbitration rules of the AAA clearly and unmistakably evidences the parties' intent that the arbitrator rule on gateway issues of arbitrability. See Terminix, 432 F.3d at 1332; see also Citigroup Global Markets, Inc. v. Berggren, No. 1:06-CV-1075-WSD, 2007 WL 9701710, at *4 n.9 (N.D. Ga. Mar. 23, 2007) (finding that the AAA Securities rules are "functionally equivalent to the Commercial rules in all relevant respects" and, thus, the Securities rules "provide that arbitrability is to be determined by the arbitrator").

What's more, the arbitration agreements here also state that: "The Parties agree that all controversies, claims, disputes and matters in question arising out of, or related to this [agreement], the performance under this [agreement], the alleged breach of any term of this [agreement] or any other matter or claim whatsoever, including but not limited to common law claims, tort claims, choses in equity and statutory claims, shall be decided by binding arbitration before the [AAA]." See, e.g., (Doc. # 1-1 at 148). Such broad

language is an additional indicator evidencing the parties' intention that the AAA, rather than the Court, would decide issues of arbitrability. See JPay, 904 F.3d at 939 (concluding that contractual agreement to arbitrate "any and all" disputes sufficed to delegate questions of arbitrability to the arbitrator); see also Shaw Grp., Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003) (explaining that a contract's broad referral of controversies to arbitration is evidence of the parties' clear intent to arbitrate issues of arbitrability).

Having concluded that the AAA is the entity that must determine issues of arbitrability, that leaves the question of whether **where** the parties should arbitrate, i.e., which arbitral forum, is a question of arbitrability. A district court in Illinois, faced with a similar case, recently concluded that "[w]here to arbitrate is a question of arbitrability, not procedure." INTL FCStone Fin., Inc. v. Jacobson, No. 19 C 1438, 2019 WL 2356989, at *4 (N.D. Ill. June 4, 2019). In that case, one party "asked the court to determine whether it agreed under FINRA Rule 12200 to submit [their] disputes to FINRA and whether defendants agreed under the arbitration agreements to submit them to the [National Futures Association], quintessential decisions for a court

15

under the [FAA]." Id.[2] The Court agrees with the reasoning of FCStone.

Thus, reading the parties' arbitration agreements as a whole, it is clear that the parties intended for the AAA to decide threshold issues of arbitrability. Viewing the clauses' broad language, inclusion of the AAA Commercial Rules, and the fact that the only entity mentioned in the arbitration clauses is the AAA, it is implicit in the parties' agreement that the AAA should be the entity to determine if FINRA rules and regulations supersede the parties' agreements. That is, the agreements can only be read to mean that "[i]n the event it is determined [by the AAA] that FINRA rules and regulations supersede any agreement to arbitrate before the [AAA]," then the arbitration may proceed before FINRA.

Plaintiffs argue that the agreements "do not 'clearly and unmistakably' select FINRA to decide injunctive relief and arbitrability." (Doc. # 28 at 6-7). The Court agrees with Plaintiffs that the language of the arbitration agreements

---

[2] FCStone did not involve a delegation provision such as the one currently before this Court. Thus, the court there applied the presumptive rule that courts will rule on issues of arbitrability in the first instance. See 2019 WL 2356989, at *4.

16

does not clearly and unmistakably evidence the parties' intention for FINRA to decide issues of arbitrability. But, as the Court has explained, the agreements do evidence the parties' intention for AAA to decide such issues.

As for the jurisdictional clauses that Plaintiffs point to, the Court notes that those clauses explicitly state that this Court's jurisdiction to enter injunctive relief is concurrent with that of the arbitration tribunals of the AAA. Accordingly, this Court is not the only entity that can grant Plaintiffs the injunctive relief they request, nor do the jurisdictional clauses in the agreements impair or invalidate the arbitration agreements because they can be read together. See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 117 F.3d 1328, 1338 (11th Cir. 1997)("[A]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable."); McArthur v. A.A. Green & Co. of Fla., Inc., 637 So. 2d 311, 312 (Fla. 3d DCA 1994) ("Clearly, we are constrained by law to construe a contract as a whole so as to give effect, as here, to all provisions of the agreement if it can be reasonably done.").

And while Plaintiffs point to American Express Financial Advisors, Inc. v. Makarewicz for the proposition that this

17

Court alone may grant them injunctive relief, (Doc. # 28 at 5, 7), the Court finds that case distinguishable because the contract in that matter plainly stated that, if a dispute was submitted for arbitration, one party was "entitled to an injunction from a court of competent jurisdiction to keep you from violating these restrictions while the arbitration is pending." 122 F.3d 936, 940 (11th Cir. 1997). Here, by contrast, the parties' agreements expressly allow this Court and AAA tribunals to enter injunctive relief. As for the 2012 MOU, which employs different wording, that contract – which Plaintiffs claim is not even binding upon the parties – does not vest exclusive jurisdiction for equitable relief with this Court. See (Doc. # 1-1 at 148).

In a similar vein, the Court is aware that it is both parties' position that this Court ought to make the determination of whether the FINRA rules supersede the parties' agreements. See (Doc. # 1 at ¶ 128) (alleging that "under the terms of the Agreements, this Court is the parties' chosen forum [and] the Agreements do not clearly and expressly preclude this Court from determining arbitrability"); (Doc. # 19 at 23) ("As the Court with jurisdiction to resolve the question of arbitrability, this Court should determine that 'FINRA rules and regulations supersede' in this matter

pursuant to the written agreements, apply FINRA Rules 12200 and 13200, and compel Plaintiffs to arbitrate Simmers['] claims against them in the FINRA Dispute Resolution Forum."); (Doc. # 28 at 3) (arguing that, under the agreements, "the parties expressly agreed that this Court would decide" issues of arbitrability). Regardless of what the parties say in their briefing, the Court is bound by the language of the contracts, and the language of the contracts is clear.

Here, Simmers' instant Motion seeks an order from this Court referring the matter to arbitration before FINRA. Given the Court's conclusions herein, such an order would be inappropriate as the AAA is the entity that must determine whether arbitration before FINRA is required. Thus, the Motion is due to be denied. If Plaintiffs wish to file a motion to compel arbitration of this matter before the AAA, they should do so promptly.

Finally, in their response, Plaintiffs also seek a stay of the proceedings before FINRA. (Doc. # 28 at 19-20). However, it is inappropriate for Plaintiffs to seek such relief from the Court through a response in opposition to Simmers' Motion. Regardless, the Court's ruling today concerns only the interpretation of the parties' arbitration agreements. The Court's interpretation is this: the AAA is

the proper entity to determine whether the FINRA rules and regulations supersede any agreement to arbitrate before the AAA, and so this Court will not make any such determination.[3] The Court will merely note that Simmers initiated the FINRA action before receiving a determination from any adjudicative body as to the role of the FINRA rules and regulations in this dispute.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

Defendant's Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay Case (Doc. # 19) is **DENIED**.

---

[3] In light of this Court's conclusions, as described herein, the Court cannot grant much of the relief sought in Plaintiffs' complaint. For example, the complaint requests that this Court make findings and enter a declaratory judgment that (1) FINRA is not the appropriate forum to resolve the parties' disputes; (2) neither Rule 12200 nor Rule 13200 of FINRA's Code of Arbitration Procedure applies here; and (3) FINRA has no jurisdiction to adjudicate the arbitration currently before it. (Doc. # 1 at 26-27). The complaint also requests that this Court permanently enjoin Simmers from pursuing any of his claims in the FINRA arbitration because the FINRA rules do not supersede the parties' agreements to arbitrate and, indeed, are inapplicable, according to Plaintiffs. Furthermore, while Plaintiffs seek a declaratory judgment, the parties' agreements are silent on the matter of which tribunal may grant declaratory relief.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 17th day of August, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE